594 So.2d 795 (1992)
Thomas Duane MOORMAN, Appellant/Cross-Appellee,
v.
AMERICAN SAFETY EQUIPMENT, Appellee/Cross-Appellant, and John Coyman and Robert Coyman, Appellees.
Nos. 89-2554, 89-2565.
District Court of Appeal of Florida, Fourth District.
January 29, 1992.
On Motion for Rehearing, Rehearing and Certification March 18, 1992.
Edna L. Caruso of Edna L. Caruso, P.A., West Palm Beach; William deForest Thompson of Thompson & O'Brien, P.A., Fort Lauderdale; and David E. French of David & French, Boca Raton, for appellant/cross-appellee.
R. Fred Lewis of Magill & Lewis, P.A., Miami, for appellee/cross-appellant American Safety Equipment.
*796 David L. Wills of Vernis & Bowling, P.A., Fort Lauderdale, for appellees John Coyman and Robert Coyman.
On Motion for Rehearing, Rehearing En Banc and Certification March 18, 1992.
FARMER, Judge.
A seatbelt left its manufacturer without operational or safety defect but with the potential, which the manufacturer knew about, to develop such a defect through ordinary use. It was then incorporated by Ford into one of its trucks. After a passenger in the truck suffered catastrophic injuries, which the seatbelt could have avoided, he sued the manufacturer under the separate theories of strict liability and negligent failure to warn. The jury found that no defect existed when the product left the manufacturer but also found that a later defect had developed for which the manufacturer was negligent in failing to warn. That verdict, it is contended, was facially incompatible with one defendant's view of the legal theories on which the case had been tried, but he sat silently by until the jury had been discharged and left the courtroom.
The question raising the most heat in this appeal is whether the passenger's entire case against the manufacturer depended on the product being defective when it left its maker's hands. In our view, however, if the kind of jury verdict given here is so obviously at odds with the substantive requirements of the law, we think that the affected party must object before the jury is discharged or face a waiver of that issue on appeal. Hence we reverse the trial court's order granting a new trial.
Thomas Moorman and John Coyman decided to cut short their afternoon of billiards and beer and return to their job site to determine which man was the better carpenter. Coyman offered to drive. As Moorman settled into Coyman's Ford truck, he attempted to engage the seatbelt but it would not work. He tried several times without success to pull the metal tongue over his lap and into the locking buckle. Coyman, who had already driven out onto the highway, suddenly lost control of the vehicle, and the truck rolled over onto the passenger side, coming to rest on its roof. Moorman was thrown partially from the truck and suffered a broken neck as a result of the accident, which left him a total quadriplegic.
Moorman sued Coyman as the owner/driver, Ford Motor Company as the manufacturer of the truck, Luke Bolton Ford as the seller, and American Safety Equipment Corporation [ASE] as the manufacturer of the seatbelt. Coyman conceded liability before trial, and Moorman settled with Ford and the seller before the verdict. The jury found all parties negligent, apportioning their negligence as follows: 51% to Coyman, 20% each to Moorman and to ASE, and 9% to the seller. They also found total damages of $7,000,000. Based upon the apportionment of plaintiff's own negligence and a set-off of $1,305,000 from the settlements, the trial court entered judgment against ASE for $4,295,000. It later granted ASE's post trial motion for a new trial, however, on the grounds that the verdict was inconsistent.
Moorman appeals the grant of the new trial. ASE appeals the denial of its motion for judgment n.o.v., the grant of a new trial on liability only without resubmitting damages, and the admission of certain medical evidence. We find it necessary to discuss only the grant of the new trial. Our discussion addresses both the procedural and the substantive aspects of the issue, for both aspects require a reversal.
The passenger's claims against ASE were set forth in separate counts. One count contained a standard strict liability claim, in which Moorman alleged that the seatbelt was defective when it left ASE's plant. The separate negligence count alleged that ASE owed a duty to eliminate any unreasonable risk of foreseeable harm and to distribute the seatbelt "in such fashion as to allow the general public * * * easy accessibility to utilize, adjust and connect the safety seat belt and/or restraint assembly system." It went on to allege that ASE had breached its duty by, among other things, failing to warn users that the seatbelt was unsafe to use in a manner in which it was intended. The negligence count conspicuously lacked an allegation *797 that the seatbelt was defective when it left ASE's plant, but it did allege that the product was either inherently or "immanently" [sic] dangerous, an allegation that we take to mean that it was or could become so.
The seat belt was manufactured by ASE according to Ford's design specifications. The design called for double stitching across the belt to act as a gravity stop to keep the tongue from falling out of the passenger's reach. When positioned below the stitching, the tongue could not reach the locking buckle at all. This, of course, rendered the seatbelt useless. After the accident, investigators found Coyman's passenger seatbelt tongue below the stitching. According to testimony at trial, the belt had been in that position since Coyman purchased the truck five months before the accident.
The stitching was supposed to be designed to enable the tongue to move back and forth to reach the locking buckle. Ford did not indicate in its design specifications how to manufacture stitching thick enough to serve as a gravity stop, yet thin enough to allow the tongue to pass over it with ease. Whether ASE succeeded in accomplishing this effect was the subject of considerable dispute at trial.
An ASE employee testified that belts would occasionally be discovered with the tongue below the stitching before being shipped to Ford. ASE employees also testified that passengers could move the tongue across the stitching by wiggling or manipulating it with both hands, but probably not by trying to force it. Other witnesses testified that anywhere from 15 to 48 pounds of force was required to pull the tongue over the stitching. ASE admittedly ran tests to measure the force needed to reposition the tongue after it slipped below the stitching but could not find any documentation of the test results.
Moorman's experts testified that, when the tongue was below the stitching, it created a safety problem which rendered the belt not "reasonably available for use" as required by the Federal Motor Vehicle Safety Standards. Experts for ASE, on the other hand, characterized the problem as a user inconvenience. Moorman's called it a manufacturing defect, and the basis of his strict liability count against ASE.
The trial judge instructed the jury to consider each of Moorman's claims separately, saying:
In your deliberations you are to consider several distinct claims. [Moorman] has one claim against [the seller] alleging negligence. He also has two claims against [ASE], one alleging negligence and the other alleging strict liability in tort. There is also a claim by [Moorman] against [Coyman] alleging negligence.
Although these claims have been tried together, each is separate from the other and each party is entitled to have you consider separately each claim as it affects that party. Therefore, in your deliberations, you should consider the evidence as it relates to each claim separately as you would had each claim been tried before you separately.
As to Moorman's negligence claim against ASE, he instructed:
The issues for your determination on the negligence claim of [Moorman] against [ASE] are whether [ASE] was negligent in manufacturing the seatbelt or in failing to warn of any defect in the seatbelt of which it was or should have been aware, and if so, whether such negligence was a legal cause of loss, injury or damage sustained by [Moorman]. [e.s.]
* * * * * *
A defendant has a duty to warn when that defendant knows or should know of any hazards associated with the use of the product which are not obvious, reasonably apparent, or not as well known to the user as to the manufacturer. [e.s.]
The jury was instructed on the strict liability claim thus:
The issues on the strict liability claim of [Moorman] against [ASE] are whether the seatbelt supplied by [ASE] was defective when it left the possession of [ASE] and if so, whether such defect was a *798 legal cause of loss, injury or damage sustained by [Moorman]. [e.s.]
The term "defect" thus appears in both the negligence and strict liability instructions. Only the strict liability instruction, however, requires that the defect be present "when it left the possession" of ASE. We note, also, that the following general definition given to the jury in the instructions is not limited in its terms to a manufacturer's plant defect:
A product is defective, under the usage as that term is used in my charges and in the verdict form, if it is in a condition unreasonably dangerous to the user, and the product is expected to and does reach the user without substantial change affecting that condition.
It is apparent that the jury discerned this distinction because during their deliberations the jury sent out a note. The court thereupon brought the jury back and the following took place:
THE COURT: I have a request here for the legal definition of defect. Is that what the jury wants?
[FOREMAN]: Yes, sir.
THE COURT: All right. As was previously given during charge, the legal definition is as follows: A product is defective if it is in a condition unreasonably dangerous to the user and the product is expected to and does reach the user without substantial change affecting that condition.
After finishing their deliberations, the jury returned a special interrogatory verdict which reflected the following findings, among others:
3(a). Did defendant [ASE] place a seatbelt on the market with a defect which was the legal cause of damage to [Moorman]?
Yes ____ No X 
3(b). Was there negligence on the part of [ASE] which was the legal cause of damage to [Moorman]?
Yes X No ____
No objection or comment was made by ASE while the jury was still in the courtroom. Nor did ASE make any attempt to assert  before the jury was discharged  that, in its mind, both of the above questions embraced a necessary finding that its product be defective when it left its possession, so that the answer to one necessarily had to be the same as the answer to the other.
Several days later, however, in a timely post trial motion for a new trial ASE newly advanced as grounds that the jury verdict was fundamentally and internally inconsistent. In granting ASE's motion, the trial court said:
The basis for granting a new trial on the issue of liability is that the Jury's finding in response to question 3(a) of the Verdict to the effect that the Defendant, American Safety Equipment Corporation, did not place a seat belt on the market with a defect is irreconcilably in conflict with its findings in response to questions 3(b) and 5 of the Verdict to the effect that there was negligence on the part of American Safety Equipment Corporation, which was the legal cause of the damage to Plaintiff. Defendant, American Safety Equipment Corporation, could not have been negligent in manufacturing and distributing a seat belt which was not defective when shipped. The Court rejects Plaintiff's contention that it would have been consistent for the jury to have reasoned that seatbelt was not defective when it left the manufacturer, but that the manufacturer was negligent in failing to warn of a potential hazard in its use, i.e., that it could become defective when the tongue fell below the stitching. A seatbelt that could not be safely used by a consumer without adequate warning of a potential danger would be unreasonably dangerous and thus defective if it left the manufacturer without benefit of an adequate warning. [e.s.]
On appeal we are met with both the procedural and the substantive aspects of the defect issue: viz., whether ASE was required to raise some objection to the verdict while the jury was still present or suffer the loss of it on appellate review, and if not whether our entire products liability law is built on the single requirement *799 that the product leave the manufacturing plant with the defect. For the convenience of all concerned we consider both, even though either one might technically dispose of this appeal.
In failing to object to the verdict in the presence of the jury, we conclude that ASE has waived this issue. It is quite basic that objections as to the form of the verdict or to inconsistent verdicts must be made while the jury is still available to correct them. In Robbins v. Graham, 404 So.2d 769 (Fla. 4th DCA 1981), we held that errors of form or consistency must be raised on the spot, even though it might be to a party's benefit to remain silent and later seek a new trial. See also Department of Transportation v. Denmark, 366 So.2d 476 (Fla. 4th DCA 1979), and Lindquist v. Covert, 279 So.2d 44 (Fla. 4th DCA 1973), to the same effect. In Robbins, Judge Stone explained that:
This principle is founded on the concept of fundamental fairness. Relitigation would deprive the appellants of their earned verdict and give the appellees an unearned additional bite of the apple.
404 So.2d at 771. In addition to these reasons, we also suggest that the importance of the right to trial by jury implicates a strong deference to a jury's decision, requiring that its verdict be sustained if at all possible. Moreover, the societal interest in furnishing only a single occasion for the trial of civil disputes would be entirely undone by the granting of second trials for reasons which could have been addressed at the first.
ASE counters that Robbins should not control because the inconsistency in this verdict is "fundamental", citing North American Catamaran Racing Ass'n v. McCollister, 480 So.2d 669 (Fla. 5th DCA 1985), rev. denied, 492 So.2d 1333 (Fla. 1986). There, the court excused a failure to make a contemporaneous objection by holding that the inconsistency was "fundamental". 480 So.2d at 671. The Fifth District did not explain what it meant by "fundamental", and no definition can be gleaned from the rest of its decision. Curiously, the court cites our Robbins decision for this proposition, but there is really nothing in it to support the citation. In fact the only place where the fundamental concept is even mentioned is in our observation that the issue did not involve "bias or prejudice on the part of the jury, nor does it involve issues of a constitutional or fundamental character." Robbins, 404 So.2d at 771.
That hardly represents an explicit decision by this court to carve out a "fundamental" exception to the rule requiring action while the jury is still in court. Actually we did little more than to note that there was no challenge there to the decision-making process itself, i.e. by a showing of jury partiality which could necessarily call into question the impartiality of the verdict. That usage is thus too slight to support such a clear break from a principle which is so important to our civil dispute resolution system.[1] Even if there had been such a challenge in Robbins, it is exceedingly doubtful that even that kind of argument could have prevailed after the jury has departed.
ASE contends that the exception is part of the fundamental error doctrine. See, e.g., Keyes Co. v. Sens, 382 So.2d 1273 (Fla. 3d DCA 1980) (failure to object to jury verdict assessing greater damages against principal than agent's conduct caused may be excused because error goes to ultimate merits of cause). The idea that even the fundamental error doctrine can be used to allow appellate consideration of issues raised for the first time on appeal, so long as the issue deals with some legal argument that might have been dispositive of the claim or defense, appears to be at once pervasive and yet entirely wrong.
Sanford v. Rubin, 237 So.2d 134 (Fla. 1970), where its existence was suggested but not used, is usually cited as the authority *800 for the idea. In that case, on the second appeal from awards of attorney's fees one of the attorneys for the City suggested for the first time that the statute on which the attorney's fee awards were based was unconstitutional. The district court ordered new briefs on the issue and ultimately reversed the awards (which they had, at least implicitly, previously approved) on the constitutional grounds.
The supreme court actually refused to excuse the previous failure to raise the issue on the prior appeals and quashed the district court decision with instructions to reinstate the awards. Properly understood, therefore, Sanford merely verbalizes the possibility of the exception but declines to apply it. Even where the exception might be employed, the court stressed that it must be used only "very guardedly", adding that it is a matter of judicial discretion. The clearest teaching in Sanford is, thus, that it is an extremely rare exception to the usual rule of waiver of issues not argued below and is probably reserved only for the exceedingly unusual case where a substantial injustice would be otherwise perpetrated.
Here, there are compelling reasons not to excuse a previous failure to speak out when the original jury itself could have corrected the supposed error. They are found, as we have already said, in the sanctity of a jury verdict and society's interest in avoiding repeat trials for the same dispute. Verdict inconsistencies which could have been corrected while the jury was still available are simply not important enough to bypass the ordinary finality attached to their decision.
Frankly, some of the recent fundamental error cases suggest that the idea is being used far too routinely. Appellate courts should not appear to strain to reach issues which have not been adequately preserved below. There is nothing unjust about refusing to relieve a party of its own failure to do something about an internal inconsistency in a verdict until long after the rendering jury had been discharged. We are thus quite loathe to take up an issue that could have been settled by submission to the jurors who had already resolved the essential factual dispute.
Lest we leave any impression that this jury did in fact err, we also address whether both of Moorman's product liability claims against ASE required the jury to find that a defect was present when the seatbelt left ASE. We begin by noting that in fact there is absolutely nothing in the court's jury instructions to the effect that:
[a] seatbelt that could not be safely used by a consumer without adequate warning of a potential danger would be unreasonably dangerous and thus defective if it left the manufacturer without benefit of an adequate warning,
as the court recited in its new trial order. We also repeat that the instructions actually given on their face allowed the jury to find ASE liable for failing to warn of a possible defect which appeared only much later through ordinary use.
To take the position accepted by the trial court is to ignore the history behind the adoption of strict liability in tort. As Justice Adkins wrote in West v. Caterpillar Tractor Co. Inc., 336 So.2d 80, 84 (Fla. 1976), "the doctrine of strict liability has evolved to complement the traditional conditional warranty and negligence theories." In West, the court adopted section 402A, Restatement (Second) of Torts, as the strict liability law of Florida. That section expressly says that it applies even though "the seller has exercised all possible care in the preparation and sale of his product * * *."
Therefore, it is unnecessary in a strict liability action to show that the manufacturer has been negligent in any way. In fact he can be found liable even though he was utterly non-negligent. It is thus obvious that strict liability has been placed into a user's arsenal of remedies as an addition to the traditional tort remedy of negligence, not in displacement of it, as ASE would have us believe. Hence, we note, in Thursby v. Reynolds Metals Co., 466 So.2d 245 (Fla. 1st DCA 1984), rev. denied, 476 So.2d 676 (Fla. 1985), the court *801 disapproved the notion that our products liability law made strict liability and negligence two separate verbalizations of a single legal concept.
Directly on point is Cohen v. General Motors Corp., 427 So.2d 389 (Fla. 4th DCA 1983), where this court squarely held that:
A duty to warn arises where a product is inherently dangerous or has dangerous propensities. Thus, a warning of a known danger in a non-defective machine is required in the exercise of reasonable care. Further, a supplier of a product who knows or has reason to know that the product is likely to be dangerous in normal use has a duty to warn those who may not fully appreciate the possibility of such danger. [citations omitted] [e.s.]
427 So.2d at 390. Our decision in Cohen constitutes an unmistakable holding that products which are non-defective when they leave the manufacturer's plant may still be the subject of a claim of negligent failure to warn against the manufacturer for non-obvious defects which he can foresee appearing after normal use by the consumer or user.
Our decision in Zyferman v. Taylor, 444 So.2d 1088 (Fla. 4th DCA), rev. denied, 453 So.2d 44 (Fla. 1984), should not be misunderstood. We said there that, whether the claim is grounded on strict liability or negligence or both, plaintiff's burden is to establish that the defect in the product existed at the time the retailer or supplier parted with possession with the product, citing Cassisi v. Maytag Co., 396 So.2d 1140, 1143 (Fla. 1st DCA 1981). 444 So.2d at 1091. But the precise issue raised in Zyferman was far different than the one raised here and had nothing to do with any displacement of negligence by strict liability in tort. As we stated it, the issue was:
whether an injured plaintiff in a strict liability case has the burden of proving that the subject product has been used normally and maintained properly from the time of its original sale to the time of the malfunction causing the plaintiff's injuries.
444 So.2d at 1089. Judge Glickstein's opinion makes unmistakably clear that our concern was whether a strict liability plaintiff has the burden of negating all other possible explanations for the injury, apart from manufacturing defect. As he said, the "mere existence of alternative theories for the accident cannot be the basis for taking the weighing of the evidence out of the jury's hands." 444 So.2d at 1092.
We are not the first state to recognize this distinction between strict liability and negligence. In Hasson v. Ford Motor Co., 19 Cal.3d 530, 138 Cal. Rptr. 705, 564 P.2d 857 (1977), the jury was instructed on strict liability that the presence of a defect when the product left the manufacturer was not required for the negligence claim. As here, the jury found no defect when the product left the manufacturer's hands, but did find negligence. On appeal, the California Supreme Court rejected the argument that the two verdicts were inconsistent. Rather, the court reasoned that even though there was no finding of strict liability, the jury logically could have found that the defect arose later (as the jury did here) and that the manufacturer was therefore negligent in failing to warn of the potential hazard. 138 Cal. Rptr. at 712-13, 564 P.2d at 864-65; accord Byrd v. Proctor & Gamble Mfg. Co., 629 F. Supp. 602 (E.D.Ky. 1986) (finding that product was not defective was consistent with finding of negligence where jury found insufficient warning concerning possible misuse); Brown v. Yamaha Motor Corp., 38 Wash. App. 914, 691 P.2d 577 (1984) (strict liability and negligence are separate, non-exclusive theories under product liability; former centers on nature of product itself while latter focuses on conduct of product manufacturer); Peterson v. Little-Giant Glencoe Portable Elevator Div. of Dynamics Corp., 349 N.W.2d 280 (Minn. Ct. App. 1984) (jury findings of negligence but no strict liability consistent where liability based on more than one course of conduct by manufacturer), aff'd in part, rev'd in part, 366 N.W.2d 111 (Minn. 1985); see also 63 Am.Jur.2d, Duty as Applicable to Nondefective Product, § 329 (1984 & Supp. 1991).
*802 We stress that, while the jury found that the seat belt left ASE's plant without defect, it nonetheless also found that a defect was present in the seatbelt later. We know this because it expressly found the seller negligent for failing to discover a defect in the seatbelt which could have been found by reasonable inspection. Hence, the jury's verdict was internally consistent. It followed the court's instructions and was in obvious harmony with products liability law in Florida and elsewhere in the country.
We therefore reverse the order for a new trial and remand with instructions to reinstate the judgment with interest from the date of the original judgment.
REVERSED AND REMANDED WITH DIRECTIONS.
GLICKSTEIN, C.J., and STONE, J., concur.
BY ORDER OF THE COURT:
ORDERED that appellee-cross-appellant's February 12, 1992, Petition for Rehearing, Rehearing En Banc, and Certification is hereby denied; further,
ORDERED that appellee-cross-appellant's motion filed March 5, 1992, to relinquish jurisdiction is hereby denied; further,
ORDERED that the Stipulation for Substitution Counsel filed March 5, 1992, is granted. The law firm of Fine, Jacobson, Schwartz, Nash, Block & England are hereby substituted for Magill & Lewis as counsel of record for the Appellee-Cross-Appellant, American Safety Equipment, in the above-styled cause of action.
NOTES
[1] ASE also cites our decision in Consolidated Aluminum Corp. v. Braun, 447 So.2d 391 (Fla. 4th DCA 1984), to support the exception for "fundamental inconsistencies." But there was no waiver issue at all raised in Braun, and our previous Robbins decision was not even mentioned. We are therefore unwilling to take Braun any farther than it goes, which was to hold that the verdict was unauthorized by both the pleadings and evidence.